Filed 11/10/20  P. v. Ortiz CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO RODRIGUEZ ORTIZ,<br><br>Defendant and Appellant. | F078351<br><br>(Super. Ct. No. VCF318031D)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Kathryn T. Montejano, Judge.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

During the course of a home invasion robbery, in concert with others, defendant Alejandro Rodriguez Ortiz participated in the assault and robbery of two victims, A.N. and A.T. Defendant was thereafter arrested and charged with multiple counts relating to both victims.

As to A.N., defendant was charged with home invasion robbery performed in concert with at least two others (Pen. Code, §§ 211, 213, subd. (a)(1)(A); count 1);[1] kidnapping to commit robbery (§ 209, subd. (b)(1); count 3); dissuading a witness by force or threat (§ 136.1, subd. (b)(1); count 4); rape (§ 261, subd. (a)(2); count 5); first degree burglary (§§ 459, 460, subd. (a); count 6); and assault with a deadly weapon (§ 245, subd. (a)(1); count 7). Multiple firearm and gang enhancements were alleged as to these counts.

As to A.T., defendant was charged with home invasion robbery performed in concert with at least two others (§§ 211, 213 subd. (a)(1)(A); count 2); assault with a firearm (§ 245, subd. (a)(2); count 8); assault with a deadly weapon (knife) (§ 245, subd. (a)(1); count 9); assault with a deadly weapon (metal object) (§ 245, subd. (a)(1); count 10); and making criminal threats (§ 422; count 11). Multiple firearm and gang enhancements were also alleged as to these counts.

The jury convicted defendant of robbery in concert under counts 1 and 2; the lesser included offense of false imprisonment under count 3 (§ 237, subd. (a)); dissuading a witness by force or threats under count 4; burglary under count 6; and the lesser included offense of misdemeanor simple assault under counts 7, 8, and 9 (§ 240). The jury was unable to reach a verdict on the rape charge under count 5, and found defendant not guilty of assault with a deadly weapon under count 10 and not guilty of making criminal threats under count 11.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The jury found true the following special enhancement allegations: defendant personally used a firearm during the commission of both robberies (counts 1 & 2) (§ 12022.53, subds. (b), (e)); and each gang enhancement allegation (counts 1, 2, 3, 4, 6, 7, 8 & 9) (§ 186.22, subd (b)(1)). The jury found not true the personal use of a firearm allegations as to counts 3 and 6 (§ 12022.5, subd. (a)).

The trial court sentenced defendant to the upper term of three years for false imprisonment (§§ 237, subd. (a), 1170, subd. (h)(1); count 3), plus an additional four years for the gang enhancement (§ 186.22, subd. (b)(1)(A)). Concurrent to this term, the court imposed the upper term of six years for burglary (count 6);[2] and three years for the gang enhancements on each count of simple assault under the alternative penalty provision in section 186.22, subdivision (d) (counts 7, 8 & 9). The court then stayed the terms imposed for counts 6, 7, 8 and 9 pursuant to section 654.

The court imposed two consecutive indeterminate terms of 15 years to life for each count of robbery in concert (counts 1 & 2) (§§ 211, 213, subd. (a)(1)(A), 186.22, subd. (b)(4)(B)), plus a 10-year term as to each count for the personal use of a firearm, which were stayed under section 654 (§ 12022.53, subds. (b), (e)); and a consecutive term of seven years to life for dissuading a witness by threat (count 4) (§§ 136.1, subd. (b)(1), 186.22, subd. (b)(4)(C)). The aggregate term imposed was seven years determinate, followed by two consecutive indeterminate terms of 15 years to life, and one consecutive indeterminate term of seven years to life.

Finally, defendant was ordered to pay various assessments and fines, and he was awarded a total of 1,313 days of custody credit on his determinate term, but not his indeterminate term.

---

**2**    We address below the trial court's failure to impose sentence on the gang enhancement found true by the jury under count 6.

3.

On appeal, defendant makes multiple claims of error: (1) the prosecution did not demonstrate due diligence in failing to secure A.T.'s presence as a witness for trial; (2) defense counsel rendered ineffective assistance in failing to request a voluntary intoxication jury instruction; (3) an assessment of defendant's ability to pay the fines and fees imposed by the court requires remand, and to the extent an objection to the fines and fees was forfeited, defense counsel rendered ineffective assistance; and (4) presentence custody credits were not properly applied. The People dispute each assertion of error.

We conclude the trial court erred in admitting A.T.'s preliminary hearing testimony, but find the error harmless. We also agree with the People there was no ineffective assistance of counsel in failing to request a voluntary intoxication instruction. We conclude the court failed to properly impose sentence on the gang enhancement found true by the jury under count 6, which requires remand for resentencing. We decline to reach defendant's two remaining arguments pertaining to sentencing in view of the remand. Defendant's ability to pay the fines and fees as well as the application of the presentence credits awarded may be raised before the trial court in the first instance upon remand.

## FACTUAL SUMMARY

I.    **The Prosecution Case**[3]

A.    **The April 2015 Incident**

In April 2015, A.N. and her then-boyfriend A.T. lived in a partially converted and detached garage behind Frank D.'s house in Dinuba. The garage did not have a bathroom, so A.T. and A.N. sometimes used the bathroom in Frank's house. They had

---

[3]    As we conclude that the admission of A.T.'s preliminary hearing testimony was error, it is excluded from the factual summary. Also excluded are statements A.T. made to officers, to which the officers testified at trial. This testimony is summarized and analyzed in context within the Discussion section, *post*.

been renting the garage for about a year, and paid rent to Frank in cash and also sometimes with drugs, including methamphetamine.

The garage A.T. and A.N. were staying in was divided into two bedrooms; defendant had lived in the back bedroom for about one month, but he had moved out about a month before the incident. Thus, at the time of the incident only A.N. and A.T. were staying in the garage. A.N. was not working at this time, but A.T. worked in the fields from about 4:00 a.m. to approximately 5:30 p.m. most days.

On April 6, 2015, A.T. went to work about 5:00 a.m. while A.N. stayed in the garage. A short time later, approximately 20 minutes, the back door to the garage flew open and three men entered, including defendant, Christopher Leal, and a third man A.N. did not recognized who was called "Jando" by the other two. When the men entered the garage, Leal, whom A.N. did not recognize, hit A.N. on the head with a small, wooden baseball bat while she was still lying on the bed; Leal also had a knife in his hand. Defendant yelled her name and A.N. thought perhaps he may have attempted to block Leal from hitting her by jumping in front of Leal.

The three men remained in the room after A.N. had been struck, talking among themselves. They began looking through A.N. and A.T.'s possessions in the garage, took money out of A.N.'s wallet, and grabbed her cellphone. The men stayed in the room all day, while other people, including a man named Cortez, came in and out of the garage taking things throughout the day without permission. During the incident, the three men told A.N. they were Northerner gang members. A.N. was frightened because they had taken her identification, which listed the address where her children lived. Although A.N. denied being in a gang, she thought people may associate her with a rival Sureño gang because she was from Los Angeles.

Defendant and Leal had a gun they were passing back and forth between them during the day. At some point after the three men broke into the garage, Frank came into the garage, spoke with the three men, and left. Everything was stolen except a television.

5.

Defendant stayed in the garage with A.N. the entire time she was there and at some point slapped her and grabbed her while he had the knife in his hand; A.N. testified he also raped her.[4]

At some point in the afternoon, A.N. asked to go to Frank's house to take a shower, and she planned to escape through the bathroom window. Defendant walked her to the house, and he told her not to report the incident. Once in the house, Frank asked A.N. how she was, she started to cry, and Frank walked away. A man named Larry was also in the house, and defendant went outside. A.N. took a shower, but she did not escape; she was kept in the house with Larry. At some point after her shower, A.N. heard Frank outside talking to Leal; Leal came into the house and told A.N. not to say anything or else she was going to pay for it, and her family was going to pay for it.

A.N. saw A.T. come home after work that afternoon; she looked out the window when she heard the car he was riding in pull up. Larry told her not to yell or said something to the effect that he did not want to do anything to her. While A.N. did not see the attack on A.T., she heard sounds of a struggle. After Leal and defendant ran through the front house, she saw them leave in a white truck. A.N. went to the garage and found A.T., who appeared bloody; he and A.N. left the garage, and a friend gave them a ride to a motel.

### B. Police Investigation

A.N. testified that the next day, she and A.T. went to the police department to obtain an escort to pick up the television from their living space in the garage. Dinuba police officer Frank Ceballos was dispatched to the lobby to meet with them regarding what he was told was a landlord-tenant issue. When A.T. and A.N. related the incident, Ceballos relayed the information and detectives were assigned to the case. Ceballos

---

[4] The jury could not reach a verdict on the rape charge, and the charge was subsequently dismissed by the prosecutor. A.N.'s testimony about the rape is not summarized.

observed injuries on A.T., including lacerations at the top of his head, behind his left ear, on his leg, and one on his left hand. Ceballos observed injuries on A.N., including a bruise on the top of her forehead and her right index finger was swollen. Ceballos testified the blood on A.T.'s injuries appeared fresh, and he believed the injuries had probably occurred within the past 24 hours. Ceballos believed both A.N. and A.T. appeared frightened.

Detectives Maldonado and Ayala were assigned to the case and went to Frank's property to investigate. They observed the main house and then a converted and detached garage at the back of the property; they took photographs, which were admitted to the jury and collected evidence, including a piece of plastic with a red substance on it consistent with blood, ripped jeans also with a red substance appearing on them, a baseball bat, and a piece of yellow tape that too had a red substance on it that looked like blood. The ripped jeans had a black belt with the letter A. Also found was a roll of yellow tape with a red substance on it consistent with blood.

In subsequent photograph lineups, A.N. identified Leal, Alejandro "Jando" Sandoval, and Bernardo Cortez as perpetrators of the crime. She identified defendant as another intruder and recognized him as having lived with them in the garage previously.

Ayala interviewed Frank, who indicated that on the day of the incident A.N. had used the shower in the house around 3:30 p.m., and she appeared to be upset and crying. Frank said A.T. and A.N. had recently paid him about $100 in rent.

On May 12, 2015, a search warrant was executed at Cortez's residence, in which Maldonado took part. Cortez's girlfriend was the only person in the apartment at the time of the search, but Norteño gang paraphernalia as identified by Maldonado was located in the residence, including a beanie with Dinuba printed on it. Maldonado also saw that Cortez's girlfriend had four dots tattooed on her left hand, which in his experience is consistent with Norteño gang members.

7.

On May 13, 2015, a search warrant was executed at Sandoval's residence. A black baseball hat with the letter "D" was found on his bedroom mattress, and Sandoval was arrested. His brother, Travis Sandoval, was also interviewed by Ayala, and when asked about Sandoval's association with a gang, Travis told Ayala something to the effect of, "'You guys know this shit, he's a gangbanger. He's on file.'"

Also in the middle of May 2015, Leal's white pickup truck was discovered and impounded. At the end of June 2015, police officers were watching Leal, who was located in an apartment in Dinuba. When officers knocked on the apartment door, a female answered and told police that Leal was inside. As this was occurring, officers outside the apartment radioed that Leal was fleeing from the apartment, but he was apprehended. They seized a red bandanna from him, which is a common piece of apparel worn by Norteño gang members.

Maldonado took part in the subsequent search of the apartment where Leal was staying. Officers searched the apartment and discovered a fixed-blade knife in a filing cabinet with six spikes on its handle, a fully loaded chrome .32-caliber revolver inside a box in a closet, as well as clothing and paraphernalia common among Norteño gang members. There was a paperwork stack that had writing on it connected with the Norteño gang.

Significantly, officers also found a blue notebook on the floor in the apartment. A gang note, known as a kite, was inside the notebook. Cecilia Burciaga, a friend of Leal, was living with her cousin in the apartment where Leal was caught climbing out the window. Leal would stay with her at her cousin's apartment from time to time. She indicated at trial the blue notebook belonged to her, she and Leal were the only people who wrote in the notebook, but she did not witness him writing this note.

On June 8, 2015, defendant was arrested. Just prior to his arrest, he was hospitalized from an incident where he was the victim. Immediately after his hospital discharge, defendant was interviewed at the police station by Ayala, and the video

8.

recording of that interview was played for the jury. Defendant stated he associated with Northerners and that he used to hang around them. Defendant initially denied anything happened at Frank's garage in April, but he later admitted that he, along with others, had gone into the garage. He identified Leal and said Leal had the weapons, and he identified Cortez as someone who showed up later during the incident. He could not identify Sandoval as the third person involved.

Then, later in the interview, defendant told Ayala that the night before the incident, Leal had picked him up in a white truck. He described Leal as a Northerner gang member and that he was a violent person. Defendant claimed it was Leal's idea to "kick the guy out" of the garage because he was not paying rent to the person who lived in the house. The next morning, defendant and Leal, picked up a third man, and drove to the garage. Leal kicked open the back door and hit A.N. with a wooden stick. Defendant jumped in front of Leal to try to stop him. Defendant said he told Leal to stop, and took A.N. to the front house so she would not get hurt. When A.T. came home later, Leal beat A.T. with a metal stick and pointed a gun at A.T.

In July 2015, Ayala also interviewed Miranda H., who had been dating Leal and who said that on the evening after the incident, she heard defendant and Leal talking about the attack on A.T. and that they had done it all for nothing.

Buccal DNA swabs were obtained by Ayala from Leal, Ortiz and A.N.; he was unable to obtain a buccal swab from A.T. A criminologist tested the red substance found on the objects recovered in the garage and determined it was blood that came from one unknown male, but the DNA in the blood did not match the buccal swabs from Leal, Ortiz, or A.N. No blood was found on the mini bat recovered at the garage, nor was there DNA recovered from the handgun found at Leal's residence. Other forensic testing revealed no latent fingerprints on either the mini bat or on the handgun.

9.

Felony charges were filed against defendant, Cortez, Sandoval, and Leal. Cortez later pleaded guilty, and Sandoval's and Leal's cases were subsequently severed from defendant's case.

### C. Gang Evidence

The prosecution theory of the case was that defendant was an active Norteño gang member at the time of the incident, as were Leal and Sandoval, and they had attacked A.N. and A.T., and robbed, assaulted and threatened them for the benefit of the gang.

#### 1. Norteño Criminal Street Gang

Detective Ayala testified as an expert on criminal street gangs. He estimated there were between 50 and 100 Norteño gang members in Dinuba. The Norteño gang also had subsets in Dinuba, including the Varrio Chico London (VCL) gang. Norteño gang members, and all the subsets, identify with the number 14 because the letter N is the 14th letter of the alphabet. The gang associates with the color red, and members have various tattoos, symbols and monikers that identify them with the gang. The subsets are all connected by the Nuestra Familia from prison; the subsets communicate, share weapons, information, and work together to commit crime. Their primary rival is the Sureño gang, but there are very few Sureños in Dinuba. The Norteño gang's primary criminal activities include murder, burglary, drug sales, and theft.

To establish the Norteños's pattern of criminal behavior, the prosecution introduced evidence of predicate offenses committed by David Rivera, a Norteño gang member, who was convicted of assault with a deadly weapon on June 5, 2012, and was required to report as a gang member pursuant to section 186.30. Ayala opined these offenses fit the pattern of criminal activities of the Norteño gang. The prosecution also introduced court records that Eleazar Huerta, another Norteño subset gang member, had been convicted of attempted robbery on April 12, 2013, and had been required to register as a gang member pursuant to section 186.30.

10.

Ayala testified about gang culture, and the importance of respect inside the culture. Ayala testified initiation into a gang requires prospective members to put in the work, i.e., do whatever the gang says, or the initiation involves being assaulted by other gang members. Gang members obtain and retain respect by committing violent crimes, and there is typically a hierarchy within the gang—higher ranking members require respect from lower ranking members. The Norteño gang has a militaristic hierarchy, and if members fail to respect the higher authorities, physical discipline will result.

### 2. Gang Membership of Defendant and Codefendants

Several officers testified about prior contacts they had with defendant. Officer Vela testified about his contacts with defendant twice in September 2004, in November 2004, and in July 2005. On September 3, 2004, Vela made contact with defendant who was a passenger in a car with two other individuals, all of whom were wearing clothing associated with the Norteño gang. Defendant told Vela he was just cruising and denied being a gang member.

On September 26, 2004, Vela again encountered defendant wearing clothing associated with the Norteño gang, and he admitted he was a member of the VCL subset gang.

In November 2004, Vela contacted defendant again. He was wearing gang-associated clothing, and he was with a known Norteño gang member. Defendant again asserted he was a member of the VCL gang. Similarly, in July 2005, Vela contacted defendant who was with a known gang member, both were wearing Norteño associated clothing, and defendant admitted he was a gang member.

In February 2008, police encountered defendant with his brother at an intersection known to be a gang hangout. Both men smelled of marijuana, defendant was wearing gang-associated clothing, and defendant admitted he hung out with gang members but denied being in a gang. He also had in his possession an illegal butterfly knife, which he claimed to have found in a field and had kept for protection. Defendant was arrested for

11.

possession of the butterfly knife, and when he was booked into the jail, his booking sheet housing classification listed him as "north" so that he would not get placed with southern gang members.

In March 2010, police pulled defendant over while driving a car after he was seen throwing a gang sign at the officers and speeding through a residential area. Upon being stopped, he resisted police commands and was arrested. He was noted to be wearing a belt with the number 14 on the buckle.

Various officers also testified about prior contacts with Leal and Cortez. In May 2005, officers encountered a vehicle with tinted windows and stopped the vehicle. Leal was driving and illegal nunchakus were found on the seat. Another officer testified he encountered Leal in April 2012. The officer described what appeared to be an argument was occurring outside a bar at closing time and one of the subjects (Zuniga) fell to the ground. Leal was part of the group, but fled when the officer arrived. After pursuing Leal, the officer followed up later with Zuniga who had a swollen eye, was uncooperative and said nothing had happened. Ayala also testified about his participation in registering Cortez as a gang member in August 2010.

In considering the contacts law enforcement officers had testified to with respect to defendant, Ayala opined defendant was a Norteño gang member on April 6, 2015. His opinion was predicated on a totality of the circumstances, including the contacts defendant had with police, that he admitted to being a gang member on several occasions, that he associated with known gang members in gang territory, that he wore gang-related clothing, and that he had been identified as a northerner in a jail booking questionnaire. Defendant also had a Norteño-related tattoo on his left hand. Ayala similarly opined that, based on his contacts with them and the evidence related by different officers during the trial, Leal, Sandoval, and Cortez were Norteño gang members on April 6, 2015. Ayala noted A.N. had admitted to him she used to be a Sureño gang member.

12.

### 3. The Kite Discovered at Leal's Residence

Ayala explained the notebook with the writing found in Leal's residence is called a kite and constitutes a note passing along information to prison gang members. This kite contained a narrative of the crime that occurred in this case, the individuals involved, and it had A.N. and A.T.'s names in it. The kite contained the letters "IR," which denoted it as an incident report. According to Ayala, this is the formal way gang members report to the higher ranking Norteños to communicate what they have done on the streets, among other things. The kite indicated the channel who was in charge of the gang at that time, and that they had received permission from the gang hierarchy to commit the crime. Ayala indicated the note also showed how many times Leal struck A.N., and the note observed that A.N. knew or identified defendant during the home invasion. The note is addressed to "La Casa," which represented the hierarchy of the gang.

This particular kite was incomplete because it cut off in the middle of the narrative. Ayala read the note to the jury as follows:

> "'IM rewriting this IR reason being my channel wouldn't take my IR because they said their names were on it starting that—stating that they being Richard Sanchez and TJ channel Dina. They said to rewrite it without there [*sic*] names in it. I said Y U gave me permission to write on—to write on the home the IR is about.

> "'First and foremost I like to say—send my utmost love and respect to La Casa, hope to find that your minds stay strong as UR hearts.' Not sure what that says. '—and standards will take you further in this—' not sure what that says '—life. Now down to the biz.'"

Ayala continued to read the note to the jury:

> "'On April 5th, 2017, approximately 7:00 a.m. I Chris Leal, Jando Sandoval, Alex Ortiz, Rize entered a home on Academy and first we got permission to do so by homeowner and channel TJ, Richard Sanchez. Upon entry I Chris Leal kicked open the door in entry. I ran into [A.N.] known X Sur 13 member.' Not sure, I believe it's, 'Suspect started screaming so I struck her on her head two times, 2 X. After the 2nd time—' I believe this is 'Defendant Ortiz came from behind and grabbed her—' illegible, I'm not

13.

sure. 'Before this I could' something 'her,' I believe Alex. 'There I knew
the victim had known the defendant—' not sure. 'I asked this—' I'm not
sure '—where is the money and drugs? She said he has it, him[.]'"

Ayala conceded this was a "rough reading" because the note was difficult to read. Ayala explained that La Casa within the Norteño gang is the house—it is basically the higher group in the prison. A channel is the upper echelon on the street level, and is generally the person who is the connection between the prison and the street gang. Therefore, the person writing this kite was identifying his crime and from whom he received permission. Ayala explained that X Sur 13 identifies a southern gang member, and gang members refer to Dinuba as Dina. The note was coming from Dinuba to La Casa.

Ayala testified this kite was consistent with other kites he has seen as a gang detective, including the note's reference to La Casa, its salute or respect given, and the IR for incident report. This note, however, was not finished because it ended with an incomplete sentence and there was no salute or closing salutation to denote some type of respect.

### 4. Expert Hypothetical

When presented with a hypothetical based on the facts of this case, Ayala opined such a crime would be committed for the benefit of, at the direction of, or in association with the Norteño criminal street gang with the intent to promote, further, or assist in criminal conduct by gang members. Ayala's opinion was based on the kite, which gave them permission from the gang for the crime, they came together as a group and devised a plan to enter the residence, and they overpowered the female to show some type of dominance over a rival gang. The violent nature of the crime benefitted the gang because it showed the gang's dominance over the neighborhood and over a rival gang member of whom they have taken advantage. The gang is also benefitted by instilling fear because it dissuades victims from testifying, making it difficult for law enforcement. A crime such

as this would also work to bolster the gang's reputation for violence. The individual gang members will raise their status within the gang.

### D. Other Witness Testimony

#### 1. Frank D.

Frank testified he rented the garage to A.T. and A.N., and when they had money he would collect some rent from them, but they were largely paying rent in trade for methamphetamine. The garage did not have a toilet or a shower, so if they needed the bathroom, they would have to use the bathroom in the house. He never evicted them or asked them to move out, and he did not know they were moving. A.N. showed up one day in April with an officer to get her things; Frank assumed they had found another place. Frank knows defendant from the neighborhood and, at one time, he was "visiting" with A.N. and A.T. in the garage. Later, defendant was looking for some place to stay and Frank offered his couch, but defendant never took the offer.

On the day of the incident, Frank never saw A.N. with defendant. Although A.N. had asked to use the shower in the main house, she was with someone he did not know— he thought it was one of her friends. He indicated A.N. frequently comes to shower, and he did not notice anything different about her demeanor on that day although she looked like she had just woken up because her hair was not combed. He did not remember telling police that A.N. looked like she might have been crying. He conceded he had used methamphetamine that day and it affected his ability to remember.

There might have been some people visiting that day at the garage, but Frank never spoke to any of them and he never saw anyone come into his house. People were always at the garage partying. On that day, he had just woken up when A.N. came to use the shower, and he went to the store after she went into the bathroom.

#### 2. Miranda H.

Miranda testified Leal was her boyfriend for approximately two months in 2015 and she also knew defendant, whom she met through friends a long time ago. She knew

Cortez because they used to live near each other, and she knew Sandoval through Leal. She was familiar with the Norteño gang, and she had hung out with Norteño gang members on occasion, which included Leal. She did not believe defendant was associated with a gang, but she knew Sandoval and Cortez were gang members.

In the summer of 2015, she spoke with Ayala, and he had asked for information about an incident that occurred in April 2015 involving Leal, Cortez, defendant, and Sandoval. At the time of trial, she remembered seeing Leal and Cortez on April 6, 2015; Leal picked her up and then they picked up Cortez in Leal's white truck around 10:30 or 11:00 a.m. They went to Frank's house, whom she knew through mutual friends. She stayed in the truck while they went into the back—she did not see what they did. She stayed in the truck for a long time, probably for an hour. No one was in the front yard, and she never saw Frank. At some point, Leal and Cortez came back to the truck, no one was with them, and they took Cortez home. Leal told her they were looking for A.T., whom she also knew through mutual friends. Leal told her they had taken over a "trap house," and they went in to see if there was money or drugs. She claimed never to have seen defendant that day, although the prosecution offered testimony from Ayala as impeachment that Miranda had told him she had heard defendant and Leal talking about the attack on A.T. later that night and that they had done it all for nothing.

### 3.  Travis Sandoval

Travis's brother is Alejandro Sandoval, and in May 2015 Sandoval was living in Dinuba at his mother's apartment. Travis lived there too with his two children. When officers searched the apartment in May 2015, Travis was at work. His son called him because his room was locked, and Travis returned to the apartment to unlock the door. Travis spoke with an officer that day, but he did not remember who it was. He did not remember saying to the officer that his brother was involved with the Norteño gang. He denied saying his brother was a gangster since his youth, and said it sounded to him like something the officer had fabricated. Travis denied knowing officers had found any

16.

gang-related items at the apartment. He indicated the hat found was probably his brother's, his brother is involved in gangs as far as Travis knew, but he did not know his brother's lifestyle.

## II. Defense Case

Appellant testified in his own defense. He indicated he had a drug and substance abuse problem that began when he was 13 or 14 years old. He knew A.N. and A.T., and had lived with them in Frank's garage for about three months. The garage did not have a bathroom, and he had slept on the floor in a small room; A.T. and A.N.'s stuff was everywhere in the garage, and it was a mess. Defendant also knew Leal and Cortez because they had all used drugs together, and Frank would also share drugs with them. The garage functioned as a trap house, which defendant explained was a place where people would use and purchase drugs. A.T. would sell drugs or trade them for various items, and he would trade drugs for rent.

Defendant moved out of the garage into the front house with Frank for about one month, and Frank asked him to evict A.T. and A.N. because A.T. was selling drugs and the police were watching the property. Frank had complained often to defendant about A.N. and A.T., and defendant told Cortez about Frank's desire to evict them, who apparently told Leal.

On April 5, 2015, Leal came over to defendant's residence and, while they were drinking and using drugs, Leal mentioned he could help evict A.N. and A.T. Around 10:00 p.m. that night, Leal and defendant went to Frank's house and continued to drink and use methamphetamine with Frank throughout the night and into the next morning while discussing the eviction.

Around 5:30 a.m. on April 6, 2015, Leal, Sandoval, and defendant went to the garage. Leal kicked open the back door of the garage, followed by Sandoval, and then defendant. Leal and Sandoval were looking for drugs and money. When they got inside, A.N. started to scream. Leal hit her with a small bat on the forehead as she sat on the

17.

bed.  Defendant got between the two of them and stopped Leal from continuing to hit her. Sandoval took A.N.'s wallet and cell phone, and Leal pointed a gun at A.N. and told her to shut up, which was the first time defendant realized Leal had a gun.  Leal demanded drugs and money, but A.N. said A.T. had it all.

Because they did not believe A.N., Leal and Sandoval spent three or four hours searching everywhere for drugs and money while defendant was ordered by Leal to watch A.N.  Defendant told A.N he was sorry and that he had not meant for this to happen, and defendant testified he knew at that time it was all a very big mistake.  He told A.N. to do whatever they said, give them whatever they wanted, and they would leave.  Defendant testified the plan was to evict A.T. and A.N., but it escalated to another level.

Frank came to the garage a couple of times throughout the morning.  Two other men named Larry and Luis, along with a female defendant did not recognize, had come to the garage and took things they wanted.  Defendant said A.N. was very calm, especially after she started smoking.

While defendant was with A.N., they took drugs together with Leal and Sandoval. Defendant stated that on the date of the incident, he was "very hooked up" on drugs.  At approximately 3:00 p.m., A.N. asked to take a shower in the front house, and defendant went with her to the house.  After showering, A.N. resumed using drugs with defendant and others, including Frank, in the front house.

Subsequently, defendant left the front house and saw A.T. return.  Defendant followed A.T. into the garage and tried to warn A.T., including telling him to give them whatever A.T. had and to just leave, but A.T. became violent with defendant and they ended up wrestling.  Leal joined in and struck A.T. with the same bat he had used to hit A.N.  Leal pulled out his gun and told everyone to be quiet or he would kill them.  When A.T. continued to fight, Leal hit him with the bat a few more times.  Leal wanted to take a television monitor in the garage, so in an effort to get Leal to leave, defendant grabbed

18.

it and then left with Leal and Miranda in Leal's truck. Defendant never saw that Leal had a knife, he only saw the gun. Defendant never handled the gun, and he had no idea how A.T. cut his leg. Defendant denied having possession of the knife, threatening either A.N. or A.T., hitting A.T. with a metal bar, or restraining A.T.

Defendant reiterated it was Frank's request that A.N. and A.T. be evicted, and it was defendant's expectation that A.T. was going to be there when they first went into the garage. His intent in the eviction was to "scare 'em" but not to hurt A.N. or A.T. He never went to the garage with an intent to steal money and drugs; everything escalated in an unintended way. Defendant testified he received no money as a result of the incident.

Defendant further testified that when he was interviewed by Ayala, and defendant had said to Ayala he thought his life was in danger if he talked to police, it was because Leal had already told defendant he thought defendant had chosen sides by trying to protect A.N. and A.T. during the attacks, and Leal had attacked defendant just before defendant was arrested. A couple of weeks after the incident with A.N. and A.T., defendant got a call from his friend Juan, who told him to come over and smoke. When defendant got to the house, he was attacked, beaten and stabbed. After being beaten, defendant feigned unconsciousness, and Leal loaded him into the back of an open-bed pickup truck and the truck began to move. At a point in the trip when the truck made a stop, defendant jumped out and sought refuge under a trailer home where he stayed for the night. The next morning, he crawled out and sought help from a nearby convenience store owner. He was taken to the hospital, which is where he first came into contact with Ayala. On cross-examination, defendant claimed he did not tell Ayala about this attack because defendant believed Ayala was interested only in what happened at the garage.

Defendant denied being a gang member, but said he was a Northerner gang associate because of the community where he lived. Defendant claimed being an associate was very different from being a gang member. Defendant got the tattoo of the four dots on his hand when he was 14 or 15 years old; he did not get permission from the

19.

gang to get the tattoo. He denied knowing that Leal was a Norteño gang member, but knew that Cortez associated with the Norteño gang. Defendant did not know the higher authority in the gang in Dinuba, and he had never given them money.

After deliberation, the jury delivered a verdict finding defending guilty on two counts of first degree robbery in concert (counts 1 & 2), false imprisonment (count 3), dissuading a witness (count 4), first degree burglary (count 6), and three counts of simple assault (counts 7, 8 & 9). The jury found defendant not guilty on counts 10 and 11. The jury was unable to reach a verdict on count 5 (rape), the court declared a mistrial on that count, and the prosecution later dismissed. Defendant was sentenced in October 2018 and subsequently filed this appeal.

## DISCUSSION

### I. Confrontation Clause: Admission of Prior Testimony of Unavailable Witness

Under the confrontation clause of both the federal and the California Constitutions, a criminal defendant is guaranteed the right to confront prosecution witnesses at trial. (U.S. Const., 6th Amend.; Cal. Const. art. I, § 15.) This right of confrontation is subject to an exception when a witness is unavailable, but at a previous court proceeding against the same defendant, gave testimony that was subject to cross-examination. (*Barber v. Page* (1968) 390 U.S. 719, 722; Evid. Code, § 1291, subd. (a).) Under this exception, the preliminary hearing testimony of an unavailable witness may be admitted at trial without violating a defendant's right of confrontation. (*People v. Herrera* (2010) 49 Cal.4th 613, 621 (*Herrera*).)

To establish unavailability in the constitutional sense, the prosecution is required to show that its efforts to locate and produce a witness for trial were reasonable under the circumstances. (*Herrera*, *supra*, 49 Cal.4th at p. 623.) The California Supreme Court has explained that the due diligence required to establish a witness's unavailability is "'"incapable of a mechanical definition,"'" but it nonetheless "'"connotes persevering application, untiring efforts in good earnest, efforts of a substantial character."'" (*People*

20.

*v. Fuiava* (2012) 53 Cal.4th 622, 675 (*Fuiava*), quoting *People v. Cromer* (2001) 24 Cal.4th 889, 904 (*Cromer*).)

A trial court's resolution of disputed facts on this issue are reviewed under the substantial evidence standard, but whether the facts demonstrate prosecutorial good faith and diligence are reviewed independently. (*People v. Sanchez* (2016) 63 Cal.4th 411, 440 (*Sanchez*).)

In this case, the prosecution was unable to secure A.T.'s presence at trial, A.T. was deemed unavailable by the trial court, and the transcript of A.T.'s January 2017 preliminary hearing testimony was read to the jury during the trial. Defendant claims the prosecution failed to diligently search for A.T., he was improperly deemed unavailable, and admitting the preliminary hearing testimony at the trial violated defendant's right of confrontation under the Sixth Amendment. As we shall explain below, we agree with defendant that the admission of this testimony was error.

## A. Background

The preliminary hearing was held on three separate days in January, with A.T. testifying on January 23, 2017.[5] In June 2018, although vacillating slightly for one week in July 2018, the trial was set for September 2018.[6]

The issue of A.T.'s unavailability was initially raised by a prosecution motion in limine filed on September 5, 2018. The parties discussed the issue briefly at a pretrial hearing on September 7, 2018, and an evidentiary hearing as to the prosecution's diligence in attempting to locate A.T. was held on September 10, 2018, the first day of trial. Three witnesses testified about the efforts to locate A.T.: Detective Ayala as well

---

[5] Another preliminary hearing was held on September 20, 2017, where police officer Moises Estrada testified regarding an added count for rape. Defendant was held to answer on that charge and a first amended information was filed on October 3, 2017.

[6] The trial had been set for May 14, 2018, but in April 2018, it was vacated and reset to September 17, 2018; on July 26, 2018, the trial was reset again to October 22, 2018, but on August 1, 2018, the trial was set for September 10, 2018.

21.

as Adam Gonzales and Alvaro Diaz, an investigator and investigator technician, respectively, who work in the district attorney's office (DA).

Ayala explained that in June 2018 he was asked to obtain DNA swab samples from A.T. and A.N. When he tried to locate them at two addresses he knew them to be associated with in Dinuba, he was told by residents at those addresses that A.N. was living at an unknown location in Dinuba as a transient and A.T. possibly had been deported sometime at the end of 2017 or early 2018. Ayala then contacted the Tulare County Sheriff's Department, who advised him that A.T. had been taken into custody sometime in 2017, and he was turned over to federal immigration officials in December 2017.

On September 6, 2018, Ayala contacted the United States Immigration and Naturalization Service (INS), and he was informed that A.T. had been deported to Mexico on March 1, 2018, but the agency did not provide any specifics about what city or location in Mexico A.T. was taken, and Ayala did not inquire how he could locate A.T. in Mexico; Ayala felt he had exhausted his resources to locate A.T. On cross-examination, Ayala stated at the time of the preliminary hearing in September 2017, he was aware A.T. was undocumented.

Meanwhile, on August 8, 2018, Gonzales, an investigator for the DA, was working to serve both A.N. and A.T. with trial subpoenas. He researched A.T.'s location in a database using both surnames A.T. had used, went to three addresses in Dinuba associated with A.T., but the residents at those locations said he did not live there. He then followed-up with the police department and was informed the next day that A.T. was possibly in Mexico, A.N. had been served, and she too thought A.T. was possibly in Mexico. After continued searching, Gonzales discovered a couple of addresses associated with A.T. in Lodi, California; he contacted law enforcement in Lodi to search for A.T. at those locations, but those authorities reported to him on September 7, 2018,

they were unable to contact A.T.  Gonzales reported to the prosecution in the middle of August that he had been unable to serve A.T.

Diaz, an Investigator Technician for the DA, was asked by the prosecution to serve A.T. on August 22, 2018.  Diaz went to the location where he had previously served A.T. about a year earlier for purposes of the preliminary hearing.  Prior to this service attempt, Diaz did not undertake any research with respect to A.T.'s address because he had been successful in the past at the address listed on the subpoena.  When he went to the address, he was informed by two residents that A.T. no longer lived there and they had heard A.T. had been deported.  Diaz was told by a supervisor to "hold off" on further service attempts and that an investigator would take over.

After considering the details of these attempts to locate A.T., the trial court ruled as follows:  "So the court has the responsibility to determine by the preponderance of the evidence the People have shown due diligence in this matter, and the court finds that the People have shown due diligence in this particular matter."

On September 12, 2018, the prosecutor informed the court additional information regarding A.T.'s location had been discovered by Gonzales.  Gonzales reported he had contacted A.N. on September 11, 2018, and she told him she had sent a message through Facebook to A.T., and he had responded on August 20, 2018, that he was in the Los Angeles area and might be coming to Dinuba, but he did not know when.  A.N. testified she had no phone number, address, or contact information for A.T., but he may have been in the Los Angeles area since August 2018.  Gonzales instructed A.N. to tell A.T. that he needed to appear in court.

Defense counsel asserted this new information impacted whether A.T. could be located for trial.  The court voiced understandable confusion about the dates in the message, and the prosecutor stated she believed the message was sent by A.T. on August 20, 2018, but only seen by A.N. on September 11, 2018.  The court asked where the message indicated A.T. was coming to Dinuba, and the prosecutor explained the

23.

message did not say that, his potential travel to Dinuba was information A.N. had passed along to Gonzales. The court asked how A.N. had learned that information to relay it to Gonzales, and the prosecutor was unsure.

Ayala, who was in the courtroom as the designated lead investigator, informed the court A.N. had indicated to him that A.T. had contacted her. The prosecutor then explained this was when Gonzales took over and spoke with A.N. regarding the Facebook message with A.T. The court expressed concern that if A.N. had the ability to contact him now, perhaps she had the ability to contact him before. Given this concern, the court indicated an Evidence Code section 402 hearing was necessary. Ayala then informed the court he had found A.N. on July 25, 2018, and she confirmed A.T. had been deported and they currently were no longer in a relationship, and this contact was part of a supplemental report.

That afternoon, on September 12, 2018 (the third day of trial), A.N. testified in an Evidence Code section 402 hearing. A.N. indicated A.T. is the father of her child, and that she has maintained contact with him through Facebook Messenger, a chat/text messaging feature of Facebook. She had seen a message from A.T. dated August 20, 2018, for the first time on September 11, 2018, which she then reported to Ayala. A.N. explained she and A.T. had lived together until his arrest in November or December 2017; after that, A.T. was taken to the Tulare County Bob Wiley Detention Facility until April 2018, and she had contacted him by telephone twice at that facility.

After his deportation, they messaged each other every day on Facebook and had video chats through Facebook. A.T. told her he was in Tijuana, Mexico, and his family, who she knows to live in Guerrero, Mexico, also told A.N. he was in Mexico. They had stopped messaging each other for a time in August and September 2018 because A.N. did not have access to the internet. When she checked her Facebook account the day before, on September 11, 2018, she saw the message from A.T. dated August 20, 2018, in which he indicated he was in the Los Angeles area, but she has no other details of where he

24.

might be or how to contact him other than through Facebook. Gonzales told A.N. to tell A.T. that he needed to appear in court; after she sent that message, A.T. had responded with a thumbs-up emoji the morning of September 12, 2018.

On redirect, A.N. acknowledged that she could not verify the Facebook text messages came from A.T., except when they communicated through the video chat function.

Upon conclusion of A.N.'s testimony, the trial court determined the prosecution had been diligent in its attempts to locate and subpoena A.T. for trial, and there was no new information indicating the prosecution should have followed-up with more investigation. The court again overruled defendant's confrontation clause objection, found that A.T. remained unavailable despite the prosecution's diligence in searching, and deemed his former preliminary hearing testimony admissible.

## B. The Trial Court Erred in Finding A.T. Unavailable

An absent trial witness is not "'unavailable'" in the constitutional sense "unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial." (*Herrera*, *supra*, 49 Cal.4th at p. 622, quoting *Barber v. Page*, *supra*, 390 U.S. at pp. 724–725.) As articulated in *Ohio v. Roberts* (1980) 448 U.S. 56, the good faith standard "does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness'[s] intervening death), 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. 'The lengths to which the prosecution must go to produce a witness … is a question of reasonableness.' [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." (*Id.* at p. 74, disapproved on another point in *Crawford v. Washington* (2004) 541 U.S. 36, 60–68.)

25.

"This good faith obligation is reflected in the language of Evidence Code section 240, subdivision (a)(5), which states that a witness is unavailable when he or she is "'[a]bsent from the hearing and the proponent of his or her statement has exercised *reasonable diligence* but has been unable to procure his or her attendance by the court's process." (Italics added.) The term "[r]easonable diligence, often called 'due diligence' in case law, "'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.""" [Citation.]'" (*People v. Andrade* (2015) 238 Cal.App.4th 1274, 1293.) The due diligence requirement imposed by California law is essentially the same as the federal constitutional good faith requirement. (*Ibid*., citing *Herrera*, *supra*, 49 Cal.4th at p. 622.)

Relevant considerations in determining whether diligent and good faith efforts were made to secure an unavailable witness include """"whether the search was timely begun'" [citation], the importance of the witness's testimony [citation], and whether leads were competently explored [citation].'" (*Fuiava*, *supra*, 53 Cal.4th at p. 675.) "'Where the record reveals, … that sustained and substantial good faith efforts were undertaken, the defendant's ability to suggest additional steps (usually … with the benefit of hindsight) does not automatically render the prosecution's efforts "unreasonable." [Citations] The law requires only reasonable efforts, not prescient perfection.' [Citation.] 'That additional efforts might have been made or other lines of inquiry pursued does not affect [a] conclusion [there was due diligence] …. It is enough that the People used reasonable efforts to locate the witness.'" (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)

Defendant claims the People's efforts to locate and secure A.T.'s appearance at trial lacked diligence in three different ways: they failed to prevent A.T. from becoming unavailable in the first place; they failed to make diligent efforts to locate A.T. in Mexico after learning in June 2018 of his deportation; and they failed to make diligent efforts to locate A.T. in Los Angeles after learning from A.N. on September 11, 2018, that A.T.

said he was in the Los Angeles area on August 20, 2018.  The People argue they had no duty to prevent A.T. from becoming unavailable, and they exercised due diligence in all respects.

As to defendant's first and last contentions, we have no difficulty concluding the People acted diligently with the information they possessed about A.T., and we address this briefly.  The prosecution is not generally required to keep periodic tabs on material witnesses.  The precautions the prosecution must take to *prevent* a witness from becoming unavailable apply only where the witness's testimony is critical or vital to the prosecution's case *and* the prosecution *knows* of a "'substantial risk'" he or she will become unavailable.  (*People v. Wilson* (2005) 36 Cal.4th 309, 342; see *People v. Hovey* (1988) 44 Cal.3d 543, 564; *People v. Roldan* (2012) 205 Cal.App.4th 969, 976–977 (*Roldan*).)

While Ayala had reason to believe A.T. was undocumented at the time of the preliminary hearing in January 2017, there was no known substantial risk of deportation at that time—he was not in the custody of state or federal authorities—and he had willingly appeared at the preliminary hearing.  While there are cases requiring the prosecution to take pre-deportation steps to secure the testimony of an undocumented witness who has been taken into federal custody by immigration officials at the time of the preliminary hearing, those cases do not extend the precautions to every witness who is undocumented.  (See *Roldan*, *supra*, 205 Cal.App.4th at pp. 983–985; *People v. Torres* (2020) 48 Cal.App.5th 731, 740–744.)  The mere possibility that A.T. might have been subject to deportation at a future time due to his undocumented status distinguishes this case from both *Torres* and *Roldan*.  Even though A.T.'s testimony was critical to the prosecution's case on certain counts, his undocumented status did not create a substantial or imminent risk that he would be unavailable for trial.  The People did not fail to prevent A.T. from becoming unavailable.

Standing by itself, we likewise reject defendant's third contention the prosecution failed to diligently pursue the information A.T. had reentered the United States sometime in August and was perhaps in the Los Angeles area. The information delivered to the prosecution on September 11, 2018, by A.N. did not provide reasonable leads for the prosecution to follow with respect to A.T.'s location in the Los Angeles area. Given the specific timing of that discovery so close to trial, it is not clear what search methods were reasonable to locate an undocumented person thought to have been in the general vicinity of Los Angeles a month prior, especially one who had only recently reentered the United States. The prosecution's investigator asked A.N. to communicate with A.T. that he was to return for trial, which she had done, and she had no other contact information for him beyond Facebook.

It is the absence of search efforts well before A.N.'s last minute revelation on September 11, 2018, that are problematic. Specifically, once the prosecution had information in June 2018 (approximately three months before trial) indicating A.T. potentially had been deported, which they discovered because there was DNA evidence from A.T. the prosecution could not locate him to procure, the cumulative efforts to locate him were less than diligent. As noted, the relevant considerations of due diligence include whether a search was timely begun, the importance of the witness's testimony, and whether leads were competently explored. (*Cromer*, *supra*, 24 Cal.4th at p. 904.) Here, A.T. was an important prosecution witness; other than defendant, he was the only eyewitness who could testify about which men from the group attacked and threatened him or otherwise assisted with the attack, the only prosecution witness who could describe how he was beaten to prove count 8 (charged as assault with a firearm) and counts 9 and 10 (each charged as assault with a deadly weapon), whether and how fear was instilled, and what was taken from his person or in his presence as to count 2 (robbery).

While A.N. placed defendant and Leal at the scene at the time A.T. arrived home, and she testified the men had a gun and a knife among them, she did not witness the attack against A.T.  She found him in the garage after she saw defendant and the others leave, and she saw only that he was bleeding.  Ceballos had seen A.T.'s injuries and photographs of them were collected, but there was no other evidence showing how those injuries were inflicted or whether the weapons were brandished as a means to instill fear or to threaten A.T.[7]

Despite A.T.'s importance to the prosecution's case, the prosecution took no timely or reasonable steps to locate A.T. in Mexico when it was discovered in June 2018 that he had likely been deported.  Deportation to Mexico does not make a witness per se unavailable.  As detailed by the Court of Appeal in *People v. Sandoval* (2001) 87 Cal.App.4th 1425, there is a mutual legal assistance treaty in place with Mexico that provides methods to invite deported witnesses back to the United States to testify in criminal proceedings with the help of local Mexican authorities or to otherwise facilitate the witness's testimony.[8, 9]  (*People v. Sandoval*, *supra*, at pp. 1438–1441.)  Thus, if the prosecution could *locate* A.T. in Mexico, there were possible options for obtaining his presence at trial and the search would not be futile, even though neither the prosecution

---

[7]     While A.T. had identified his attackers to Ayala and gave his version of what happened, if A.T.'s testimony could not be admitted at trial, Ayala's testimony about what A.T. told him would be inadmissible, testimonial hearsay.

[8]     In December 1987, the United States and Mexico negotiated and signed the Treaty on Cooperation Between the United States of America and United Mexican States for Mutual Legal Assistance.  (Mexico-United States Mutual Legal Assistance Cooperation Treaty, Dec. 9, 1987, Sen. Treaty Doc. No. 100-13, eff. May 3, 1991, 27 I.L.M. 433 <https://www.state.gov/wp-content/uploads/2019/02/91-503-Mexico-Mutual-Legal-Assist-Treaty.pdf> [as of Nov. 10, 2020] (the treaty).)

[9]     Among several other possibilities, under article 7 of the treaty, the prosecution could have enlisted the aid of Mexican authorities to compel the witness to appear in Mexico to testify at trial through the use of teleconferencing.  (*People v. Sandoval*, *supra*, 87 Cal.App.4th at p. 1443.)

29.

nor the court could *compel* his return.[10] (*Barber v. Page*, *supra*, 390 U.S. 719 723–725 [good faith effort must be undertaken to obtain attendance of witness for trial even though the court itself does not have the power to compel the attendance of a witness].)

Here, in June 2018, Ayala was searching for A.N. and A.T. to obtain DNA samples for evidence to support the case, and he obtained information then that A.T. may have been deported.[11] There were a number of steps possible to seek information about A.T.'s location, but unfortunately none were undertaken. None of the persons who had informed Ayala that A.T. probably had been deported were asked whether they had information about his possible location in Mexico. There is no evidence in the record when Ayala inquired with the Tulare County Sheriff's Department about A.T., and, after receiving official word A.T. had been turned over by the Sheriff's Department to INS, no effort was made to confirm the deportation with INS until September 6, 2018—a day *after* the prosecution filed a motion in limine to declare A.T. unavailable for trial. Given the pendency of trial, once it was discovered in June 2018 that A.T. may have been deported, the delay in seeking information regarding the deportation from any official channel also factors into the diligence calculus.

Moreover, when Ayala spoke to an INS agent, he asked no questions about possible locations for A.T. in Mexico. To the extent Ayala did not have time resources to devote to locating A.T.'s whereabouts in Mexico, it is inexplicable why the prosecution

---

**10** A notable exception was explained in *Herrera* where the witness had been deported to El Salvador, a country with no type of treaty or agreement to compel or facilitate a witness's attendance at a trial in the United States. (*Herrera*, *supra*, 49 Cal.4th. at pp. 628–629.) In that situation, even assuming the steps to locate the witness in El Salvador came too late, the search was deemed futile because there was no possible way to obtain his return to give testimony at trial. (*Id.* at p. 629.)

**11** While there is nothing in the record showing when Ayala informed the prosecutor that A.T. may have been deported, Ayala's inability to collect DNA evidence from A.T., as he was tasked with procuring for the prosecution, had to have been made known to the prosecutor well before September.

did not turn the search over to the DA's investigation bureau in June, July or even August.

In July 2018, Ayala spoke to A.N. and she told him A.T. had been deported and they were no longer in a relationship, but there is no evidence Ayala asked whether A.N. and A.T. had continued contact, whether she knew where he was in Mexico, whether she had contact with his family or knew of his family's location. As it turns out, A.N. *did* have information that A.T. was in Tijuana, she knew his family lived in the state of Guerrero, she maintained *daily* contact with A.T. after his deportation—including video chats; apparently maintained contact with his family, and she knew the address of his Facebook profile and how to reach him on that platform.[12] Whether or not A.N. would have been forthcoming with Ayala in July 2018 is not the issue—the problem is no effort was made by anyone to solicit information about A.T.'s whereabouts from A.N. or definitively conclude she had no helpful information.

Meanwhile, Diaz and Gonzales from the DA's investigation bureau—who were not in communication with each other—were both searching for A.T. in California in August. Diaz attempted to serve A.T. at the location A.T. had previously been served in Dinuba, but was told by residents at that address that A.T. had been deported. He reported this to his supervisor, who said to stop any further attempts, and an investigator would take over. But, Gonzales had already been trying to find A.T. earlier in August by searching in Dinuba and had discovered A.T. had likely been deported. Nothing in the record indicates anyone directed Gonzales to search for leads about A.T.'s whereabouts in Mexico.

Neither Gonzales nor Diaz had been informed prior to search efforts about the probable deportation. Sending investigators to addresses where A.T. had previously been associated was perhaps still necessary to diligently establish A.T. had not reentered the

---

[12] She testified his family told her that A.T. was in Mexico.

country after deportation and returned to the area. But, sending out investigators without information that A.T. had likely been deported to Mexico and that any possible leads about his location in Mexico were desired, effectively precluded Diaz and Gonzales from asking questions of the residents they encountered who knew A.T. had been deported about whether they had information about A.T.'s location in Mexico. It was another lost opportunity to turn up information the prosecution could pursue, or prove diligent searching was unfruitful.

The lack of diligence here does not stem from the failure to take all of these search steps or any specific combination of them—in hindsight it is almost always possible to find some other search avenue left unexplored. (*Hardy v. Cross* (2011) 565 U.S. 65, 71– 72 (per curium) ["it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence [citation], … the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising"]; accord, *Fuiava*, *supra*, 53 Cal.4th at p. 677 [additional efforts that might have been made or lines of inquiry not pursued does not necessarily affect the conclusion diligence was exercised—reasonableness is the touchstone].) Nevertheless, as one federal appellate court has articulated the constitutional good faith requirement, reasonable diligence requires "a search equally as vigorous as that which the government would undertake to find a critical witness if it has no preliminary hearing testimony to rely upon in the event of 'unavailability.'" (*United States v. Lynch* (D.C. Cir. 1974) 499 F.2d 1011, 1023.)

Conceptualizing the due diligence continuum on a thermometer, reasonable and good faith search efforts do not require a perfect 98.6 degrees (*People v. Diaz*, *supra*, 95 Cal.App.4th at p. 706 [law requires only reasonable efforts, "'not prescient perfection[]'"]), but in every case short of certain futility (*Herrera*, *supra*, 49 Cal.4th at p. 629), diligent efforts must still register somewhere north of cold, frosty zero. (See *Barber v. Page*, *supra*, 390 U.S. at p. 723 [diligence not demonstrated when state made

32.

"absolutely no effort" to obtain the presence of witness at trial other than to ascertain he was in a federal prison outside the state].)

In this case, the glaring deficiency is the prosecution took *no* steps to locate A.T. in Mexico—once it was known in June 2015 that he had likely been deported, the only information sought was last-minute confirmation he had, in fact, been deported to Mexico. In noteworthy contrast, we observe the diligent efforts that were taken in *Sanchez* to find a witness who had returned to his home country of Mexico before trial unbeknownst to the prosecution. (*Sanchez*, *supra*, 63 Cal.4th at p. 441.) There, a prosecution witness (Rivera), who was a Mexican national, told people he knew several months before trial that he was moving back to Mexico and was not planning on returning to the United States. (*Ibid.*) In searching for Rivera before trial, the prosecution investigators discovered from others that Rivera had left, he was no longer at his former address, employment, or phone numbers. (*Ibid.*) With the assistance of INS, an investigator determined Rivera was a Mexican national and located Rivera's brother in San Francisco, who informed the investigator that Rivera had moved to Mexico with no plans to return. (*Ibid.*)

Rivera's brother had no telephone number for Rivera because Rivera was located in a village outside of Guadalajara that had only one phone. His brother made attempts to leave messages that Rivera return the call, but to no avail. The investigator followed up with Rivera's brother again shortly before the due diligence hearing and he reiterated he had made several attempts to call Rivera and had left messages for Rivera to call him back, but he had not heard from Rivera. (*Sanchez*, *supra*, 63 Cal.4th at p. 441.) The trial court, and ultimately the California Supreme Court, agreed the prosecution had exercised due diligence. (*Id.* at pp. 441–442.) The high court also noted Rivera's testimony was not particularly important because he was one of many witnesses whose testimony was consistent and who, collectively, overwhelmingly established the defendant's guilt of the crimes about which Rivera testified: "In a case like this, with dozens of witnesses, there

33.

is a limit to what one can expect the prosecution to do to procure the attendance of a noncritical witness." (*Id*. at p. 442.) A.T.'s testimony here was far more important to the prosecution's case than Rivera's had been in *Sanchez*, and yet the prosecution did not even attempt to locate A.T. in Mexico.

In sum, A.T. was not per se unavailable just because he was deported to Mexico. Under the specific circumstances presented, diligence required *some* timely effort (no matter if ultimately unsuccessful) to locate A.T. in Mexico. That did not occur, and we are led to the inexorable conclusion the trial court erred in determining the prosecution met its burden of establishing its diligence in attempting to locate A.T. and that A.T. was unavailable for purposes of the Sixth Amendment.

## C.     Harmless Error

Finding an error of constitutional magnitude, we must consider the effect of that error on the verdict reached. Reversal is required unless the record establishes beyond a reasonable doubt that defendant was not prejudiced. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) *Chapman* "requir[es] the beneficiary of a [federal] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Ibid.*) "'"To say that an error did not contribute to the ensuing verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the … verdict actually rendered in this trial was surely unattributable to the error." [Citation.]'" (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

Whether a confrontation clause violation is harmless beyond a reasonable doubt under *Chapman*, courts consider factors such as "the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on

material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 684.) This determination requires that a reviewing court "examine the entire record[]" to evaluate the effect on the jury's verdict. (*People v. Canizales* (2019) 7 Cal.5th 591, 615; see *Rose v. Clark* (1986) 478 U.S. 570, 583.)

Defendant argues that without A.T.'s preliminary hearing testimony, the prosecution's case would have been significantly weaker and he would have been acquitted as to count 2 (robbery in concert (§§ 211, 213)), and counts 8 and 9 (simple assault (§ 240)). The People maintain any error in deeming A.T. unavailable was harmless because even in the absence of A.T.'s testimony, the evidence of defendant's guilt was overwhelming.

The prejudicial error test under *Chapman* is stringent, but particularly in view of defendant's trial testimony admitting the essential elements of the crimes under counts 2, 8 and 9, and the prosecution's strong circumstantial case, we conclude the error of admitting A.T.'s testimony was harmless. When we consider the entire record, weigh the relevant factors, analyze the specific counts, and examine the effect the error had on the trial, we are persuaded beyond a reasonable doubt that A.T.'s preliminary hearing testimony had no effect on the verdict on counts 2, 8 and 9.

### 1. A.T.'s testimony and Additional Related Testimony and Proceedings

#### a. A.T.'s Preliminary Hearing Testimony

A preliminary hearing was held on January 23, 2017. A.T. testified that he had lived in Frank's garage for around six months with his wife, A.N., and defendant had also lived there. Defendant had moved out about a month before this happened, and he had never had any problems with defendant. A.T. also thought there was no problem with Frank.

On the day of the incident, he arrived home about 5:30 p.m. and saw a white pickup truck parked in front of the property. Though he had called A.N. several times during the day, she had never answered, and this worried him. When he entered the garage, he was hit in the head with a pipe by defendant, causing a cut on his forehead. Leal, who appeared to come from the front house, attacked him from behind. He did not recognize Leal by name, but he described him as having a goatee and a Raiders tattoo with red lines coming down from his forearm. While A.T. struggled to defend himself, he was knocked down by defendant and Leal. Leal was holding a knife and a gun, and then stabbed A.T. with the knife in A.T.'s left hand and leg. Defendant and Leal tied him up, and then took about $400 or $500 from A.T.'s wallet.

A.T. described the gun Leal was holding to be a .32- or .38-caliber chrome weapon; the knife Leal was holding had little spikes on the blade. Leal was also talking about the Norteño gang. While A.T. denied being involved with any gang, he thought he was attacked because A.N. had been a Sureño for a long time. Leal, while pointing a gun, threatened A.T. that he would kill A.T. if he told the police anything, and A.T. was directed to leave the garage permanently. If they found A.T. in the garage when they came back, they said they would kill him.

After defendant and Leal left the garage, A.T. sat in the garage and cried; A.T. knew defendant and thought they were friends, and he never thought defendant would attack him. A.T.'s leg was bleeding, and when one of his friends showed up, the friend took him and A.N. to a motel. A.T. admitted that he was a drug user at the time of the incident, but denied he sold drugs.[13]

He talked to a detective twice after the event, and from photographs he identified the people he recognized. He testified that he heard the names Chris and Bernardo during

---

[13]    A.T. also testified that he later discovered defendant had raped A.N. during the April 6, 2015, incident. The jury was unable to reach a verdict on the rape count, and the charge was later dismissed; thus, his testimony relevant to the rape charge is not summarized.

the attack, but in his statement to Ayala he reported hearing the names Alex and Chris. When he made his report about the incident to Ceballos, he did not say his attackers had a gun or a knife because he was afraid.

### b. Additional Trial Testimony and Proceedings Related to A.T.'s Testimony

Ceballos testified A.T. told him they were attacked by Norteño gang members, but he did not want to give names because he feared for their safety; A.T. did not identify defendant to Ceballos.

A.T. also reported to Ayala what happened, which Ayala testified about at trial. According to Ayala, he had spoken with A.T. several times. A.T. told Ayala that two men had tied him up with tape, and one of them had a stick, a knife, and a gun; A.T. described the knife as one with a long blade and spikes on the handle. A.T. described the first individual as approximately 5 feet 6 to 5 feet 8 inches tall, dark complexion, thin build, goatee, dark hair, black eyes, short hair with a scar over his eyebrow. Ayala later concluded this was a description of defendant.

A.T. said his attackers said they were Northerners and told A.T. that he was a Sureño and had to die, although A.T. denied he was a gang member. Later, A.T. identified defendant and Leal from a photographic lineup as the people who attacked him, and he identified a photograph of a gun police had seized as one used in the attack, and he identified the knife seized by police as the one Leal used to cut him with during the incident.

During the course of deliberations, the jury sent four questions to the court on the counts related to A.T. and his preliminary hearing testimony. Specific to counts 2, and 8 through 11, the jury asked the following: (1) "Can we hear the testimony from [A.T.] regarding: [¶]—what he was tied up with[;] [¶]—what he was hit with[?]"; (2) "Can we have [t]he court reporter read back [A.T.'s] testimony regarding: [¶]—who threatened him[?]"; (3) "Regarding counts 8, 9, & 10: [¶] If we find the defendant NOT GUILTY

37.

OF the greater charge …. [¶] … [¶] can the defendant be found guilty of simple assault if we believe he did not have/use any weapon[?]"; and (4) "Regarding count 8 [¶]—If we find the defendant NOT GUILTY, [h]ow does [t]he lesser charge of simple assault apply to the lesser charge?"[14]

## 2. Jury's Verdict on Counts Related to A.T.

As already noted, count 2 alleged that defendant, along with Sandoval and Leal, committed home invasion robbery in concert with respect to A.T with special enhancement allegations that a principal in the robbery personally used a firearm in the commission of the offense (§ 12022.53, subds. (b), (e)(1)), and that the robbery was committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)(C)). The jury found the defendant guilty of the offense, found true that it was performed in concert with two or more people, found true that a principal personally used a firearm, and that it was committed to promote, further and assist in criminal conduct of gang members (§ 186.22, subd. (b)).

Count 8 alleged that defendant, Sandoval, and Leal assaulted A.T. with a firearm (§ 245, subd. (a)(2)), with personal use of a firearm and a gang enhancement allegation. Count 9 alleged that defendant, Sandoval, and Leal committed assault upon A.T. with a deadly weapon (a knife), with a gang enhancement allegation. Count 10 alleged defendant, Sandoval and Leal committed assault on A.T. with a deadly weapon (a metal object), with a gang enhancement allegation. Count 11 alleged that defendant, Sandoval and Leal made criminal threats of great bodily injury to A.T. with a firearm and a gang enhancement allegation.

---

[14] The court requested more clarification as to this last question, and referred the jury to CALCRIM No. 3517. No follow-up question was received, apparently.

As to counts 8 and 9, the jury found defendant not guilty of assault upon A.T. with a firearm and not guilty of assault upon A.T. with a deadly weapon (knife), but guilty on both counts as to the lesser included offense of misdemeanor simple assault. The jury also found true the gang enhancement allegation on each count. As to count 10, the jury found defendant not guilty of assault upon A.T. with a deadly weapon (a metal object) and not guilty of the lesser included offense of misdemeanor simple assault. As to count 11, the jury also found defendant not guilty.

### 3. Whether Error Contributed to Robbery Verdict (Count 2)

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) The crime is essentially a theft with two aggravating factors: a taking (1) from a victim's person or immediate presence, and (2) accomplished by the use of force or fear. (*Miller v. Superior Court* (2004) 115 Cal.App.4th 216, 221.) First degree robberies include those that are committed in an inhabited dwelling. (§ 212.5.) The jury was instructed it could find defendant guilty of in-concert robbery on an aiding and abetting theory of liability. An aider and abettor to a specific intent crime must share the specific intent of the perpetrator. (*People v. Beeman* (1984) 35 Cal.3d 547, 560.) To find defendant guilty of robbery in-concert, the jury was instructed that it must be established beyond a reasonable doubt that defendant personally committed a robbery or aided and abetted a robbery, voluntarily acted with two or more other people who also committed or aided and abetted the robbery, and the robbery was committed inside an inhabited dwelling. (§ 213, subd. (a)(1)(A); see CALCRIM No. 401.)

The prosecution's case, even absent A.T.'s preliminary hearing testimony, was strong but entirely circumstantial as to the counts pertaining to A.T. There was abundant evidence defendant, Leal and others had been at the property all day, they had already robbed A.N., and were waiting for A.T. to get home from work. There was also strong evidence, including defendant's arrest interview and A.N.'s testimony, that Leal,

39.

defendant and another person named Larry (who was watching A.N. inside the front house in the afternoon) were still on the property when A.T. arrived home, and that they were looking specifically for A.T. Miranda testified Leal told her they were taking over the trap house and they were looking for A.T. Testimony from Miranda, Frank, and defendant indicated or implied A.T. sold drugs, and defendant admitted Leal and Sandoval had been looking for money and drugs when they first entered the garage that morning. The kite discovered at Leal's residence described that Leal had asked A.N. where the money and drugs were, and that A.N. had said that "'he'" has it, ostensibly meaning A.T. A.N. testified they were asking for A.T. when they first broke into the garage. There was a strong inference they were waiting for A.T. to get home so they could rob him, as they had A.N.

As to what happened when A.T. arrived home many hours later, A.T. was the only prosecution eyewitness to his attack who could provide direct evidence of what was taken from him during and after the attack and under what conditions. In defendant's arrest interview, he said that the people who were at the house "wanted to do something to the guy[,]" referring to A.T., and that Leal attacked A.T. with a metal stick when A.T. arrived home. A.N. saw A.T. arrive home, but she did not witness the attack on A.T., nor did she indicate what had been taken from A.T. during the attack. She witnessed A.T.'s resulting injuries, but she did not see how they were inflicted or who had inflicted them. Officer Ceballos saw injuries on A.T. the next day, and pictures were also taken of A.T.'s injuries—Ceballos testified the injuries looked less than 24 hours old and appeared to him as though they required medical attention.

Without A.T.'s testimony, the prosecution had a strong circumstantial case that A.T. was robbed by Leal and defendant given they had already robbed A.N. and were waiting for A.T. to come home. There was also strong evidence to support an inference that whatever was taken from A.T. was accomplished by force, given his injuries as described by A.N. and Ceballos, and the photographs taken of the injuries.

40.

But it was defendant's testimony that provided the most damaging and overwhelming evidence of his guilt with respect to A.T.'s robbery. While defendant indicated he was trying to prevent A.T. from being assaulted by Leal, he testified that before they started fighting, he told A.T. to give Leal whatever he had so A.T. could leave. Once A.T. and defendant started fighting because A.T. ostensibly misunderstood what defendant was trying to accomplish, Leal appeared and hit A.T. with a bat and defendant told Leal to stop. Leal stopped, pulled out a gun, and threatened A.T. Defendant testified he stepped in between Leal and A.T., and then grabbed a television monitor defendant knew Leal wanted in an effort to protect A.T. and get Leal to leave. With respect to the attack on A.T., defendant's testimony echoed A.T.'s preliminary hearing testimony in most aspects. With the inclusion of defendant's testimony, the evidence conclusively established defendant participated in robbing A.T. even though he may have tried to prevent A.T. from being assaulted in the course of the robbery, and that he ultimately did so by applying force in fighting with A.T. Given that defendant confessed to the essential elements of the crime, in conjunction with all the circumstantial evidence offered by the prosecution, A.T.'s testimony did not affect the jury's verdict.

As to the downstream effects of the erroneous admission on the course of the trial, we also conclude they did not affect the verdict. (See *People v. Stritzinger* (1983) 34 Cal.3d 505, 520 [conducting *Chapman* error analysis requires court to weigh the impact of the error not only on the decision of the jury, but also on the course of the trial].)

Specifically, A.T.'s statements to Ayala and Ceballos about the attack and his identification of Leal and defendant would not have been admissible but for the admission of A.T.'s preliminary hearing testimony.[15] However, Leal and defendant's participation in the attack on A.T. was overwhelmingly established by other evidence,

---

[15] The jury was instructed to consider the officers' testimony in this regard only for the nonhearsay purpose of evaluating A.T.'s credibility, not for the truth of the matter asserted.

41.

especially including defendant's trial testimony, which in most regards corroborated A.T.'s testimony as to what occurred, as well as defendant's arrest interview, A.N.'s testimony, and what Miranda told Ayala she had heard about Leal and defendant beating up A.T.

We also note the prosecutor emphasized A.T.'s testimony in closing arguments and highlighted A.T's statement that several hundred dollars had been taken from him—which was the only evidence *money* had been taken from him. But, given all the circumstantial evidence that A.T. was robbed, especially defendant's testimony that he took a television during the attack on A.T. and had told A.T. to give Leal whatever he had, this emphasis in closing arguments beyond doubt had no effect on the robbery verdict.

During deliberations, the jury asked for a readback of portions of A.T.'s preliminary hearing testimony about how he was tied up, what he was hit with, and who threatened him, but those portion of A.T.'s testimony was not particularly relevant to the robbery count, and was likely advantageous to defendant because A.T. had testified defendant had not threatened him or used the gun or the knife. This review of A.T.'s testimony did not contribute to the verdict on robbery in light of all the other evidence the jury considered.

We contrast our conclusion of harmless error under *Chapman* with the determination of prejudicial error in *People v. Foy* (2016) 245 Cal.App.4th 328 (*Foy*), which also involved a robbery. There, conditional examination testimony of an unavailable witness (Song) was admitted at trial, which was deemed error on appeal. (*Id.* at p. 350.) In conducting the prejudicial error analysis under *Chapman*, the court noted that although Song's testimony about the circumstances of the robbery was cumulative to other live witness testimony, there was no other witness identification that linked the defendant to the robbery. (*Id.* at p. 351.) The prosecution's critical and strongest evidence of a link between the defendant and the robbery came from Song's

42.

identification of the contents of a flash drive later found in the defendant's pant pocket. (*Id.* at pp. 336, 351.) Notably, the appellate court pointed out that while there was other circumstantial evidence linking the defendant to the robbery, the defendant had testified and presented an uncorroborated alibi and some explanation for the incriminating evidence against him. (*Id.* at p. 351.) The case had been tried twice, and both times Song's testimony had been admitted. However, the first case ended in a deadlocked jury, which suggested a close case even with Song's testimony. (*Id.* at p. 352.) The court found the admission was not harmless beyond a reasonable doubt. (*Ibid.*)

Here, A.T.'s testimony was not the only evidence linking defendant to the robberies and assaults that day. Defendant himself conceded in his arrest interview that he was at the house and had witnessed Leal assaulting both A.N. and A.T., and he testified at trial they went into A.N. and A.T.'s living space in the garage to perform what he termed an eviction. Beyond that, unlike in *Foy*, defendant admitted he was involved in the robbery and assault on A.T., but he was attempting to shield A.T. from an assault by Leal. Different too was the initial deadlocked jury in *Foy*, which suggested a close case even with the inadmissible testimony. Given the strength of the prosecution's case here, even if comprised only of circumstantial evidence absent A.T.'s testimony on count 2, defendant's admissions in his testimony at trial, and the lack of evidence such as a deadlocked jury to indicate a close case, we conclude beyond doubt that A.T.'s testimony did not contribute to the verdict on the robbery count.

### 4. Whether Error Contributed to Simple Assault Verdicts

The jury also found defendant guilty of two counts of simple assault stemming from the attack on A.T. As the jury was instructed, to prove defendant was guilty of simple assault, the People were required to establish beyond doubt that defendant did an act that by its nature would directly and probably result in the application of force to a person; defendant did that act willfully; when defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and

43.

probably result in the application of force to someone; and when defendant acted, he had the present ability to apply force. (§ 240; CALCRIM No. 915.)

Viewing the record without A.T.'s former testimony, the evidence overwhelmingly established defendant's guilt on these counts. Defendant admitted in his arrest interview that A.T. had been beaten up, and Ayala testified Miranda told him she had heard defendant and Leal talking later that night about beating A.T., and that it had all been for nothing. And while none of A.T.'s statements to Ceballos or Ayala about who attacked him or what happened were admissible without A.T.'s preliminary hearing testimony, photographs of A.T.'s injuries were admitted as well as A.N.'s testimony of the condition in which she found A.T. immediately after defendant and others left the property. Most importantly, defendant admitted on the stand that he wrestled with A.T. and hit A.T. with his fists. Simple assault is not a specific intent crime—it did not matter why defendant struck A.T. With defendant's admission of this on the stand, the evidence on the simple assault counts was ample, and beyond doubt the jury would have found defendant guilty of simple assault even in the absence of A.T.'s testimony.

### 5.      Gang Enhancements on Counts 2, 8 and 9

The parties make no specific argument about the gang enhancement allegations that the jury found true on counts 2, 8 and 9, but we conclude A.T.'s testimony did not contribute to the jury's true findings as to these special allegations. A.T.'s preliminary hearing testimony added very little with respect to the gang enhancement allegations, other than the perpetrators appeared to be Norteño gang members, which was established by ample other evidence. While A.T. indicated only that Leal was saying things about the Norteños that A.T. did not understand at the time of the attack, Ayala provided uncontroverted expert opinion testimony that defendant was a Norteño gang member who was acting in concert with other gang members at the express permission of and with the specific intent to benefit the Norteño gang. Defendant makes no argument on appeal that the gang expert's testimony, along with the other related evidence, was insufficient to

support the true finding on the gang enhancement or that A.T.'s testimony had any bearing on the jury's verdict in that regard.

Ayala opined defendant was an active member of the Norteño gang on the date of the charged crimes based on multiple contacts police had with defendant, and he opined Leal, Cortez, and Sandoval were active Norteño gang members at that time. Miranda testified she knew Leal, Cortez, and Sandoval to be gang members. A.N. testified she heard defendant, Leal and Sandoval say they were Northerners during their robbery of her. While defendant denied he was a member, he conceded he associated with the Norteños for fear of reprisal and that he knew Cortez was a Norteño. He also indicated in his testimony he kept watch over A.N. at Leal's command, and grabbed a television from A.T.'s presence because he knew Leal wanted it.

The partial kite discovered in Leal's residence furnished even more persuasive evidence the crime had been committed at the express consent of the Norteño gang's higher authority, and Ayala opined the crimes were meant to profit the gang and increase the stature of the gang member participants.

In light of the other evidence establishing the crimes were committed by defendant with the specific intent to assist or further benefit the Norteño gang, there is no doubt A.T.'s hearing testimony did not contribute to the jury's true findings on the gang enhancement allegations as to robbery (count 2) and simple assault (counts 8 & 9).

## II. Ineffective Assistance of Counsel: Voluntary Intoxication Instruction

Defendant argues defense counsel rendered ineffective assistance in failing to request a pinpoint jury instruction for voluntary intoxication. The People dispute any failure to request an instruction for voluntary intoxication amounted to ineffective assistance of counsel. We agree with the People.

### A. Legal Standards

The defendant bears the burden of proving ineffective assistance of counsel. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) To prevail on such a claim, a defendant

"'must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice.'" (*People v. Hart* (1999) 20 Cal.4th 546, 623.) On review, a strong presumption applies that counsel's conduct fell within the wide range of reasonable professional assistance. (*Strickland v. Washington* (1984) 466 U.S. 668, 689.) Tactical mistakes are generally not reversible, and counsel's strategy and decision making must be considered in the context of the available facts. (*Id.* at p. 690.)

"To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. [Citation.] Moreover, prejudice must be affirmatively proved; the record must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*People v. Maury*, *supra*, 30 Cal.4th at p. 389, quoting *Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

## B. Analysis

Defense counsel did not request a voluntary intoxication jury instruction, although there were specific intent crimes to which the instruction theoretically could have applied.[16] Though the record contains no explanation why defendant's trial counsel did not request the instruction, there is a good reason not to have done so: even if he had, the court would have correctly refused to give it.

"Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent …." (§ 29.4, subd. (b).) A

---

**16** Defendant was convicted of several crimes requiring proof of a specific intent: intimidating a witness under section 136.1 (*People v. Navarro* (2013) 212 Cal.App.4th 1336, 1351 [§ 136.1 is limited in application to those who intentionally act to prevent or dissuade a witness or victim from reporting a crime]; robbery (§§ 211, 213); burglary (§ 459); and the gang enhancement under § 186.22, subd. (b)(1)).

trial court has no sua sponte duty to instruct that a defendant's voluntary intoxication may be considered in determining the absence of the required criminal intent. Rather, the defendant must request a voluntary intoxication instruction. (See *People v. Hughes* (2002) 27 Cal.4th 287, 342; *People v. Saille* (1991) 54 Cal.3d 1103, 1119–1120.) A trial court is required to give a requested jury instruction only if it is supported by substantial evidence, i.e., evidence sufficient to deserve jury consideration. (*People v. Marshall* (1997) 15 Cal.4th 1, 39–40.)

To warrant a voluntary intoxication instruction, there must be substantial evidence of the defendant's voluntary intoxication and that "'the intoxication affected the defendant's "actual formation of specific intent."'" (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.) In other words, even if requested, "an intoxication instruction is not required when the evidence shows that a defendant ingested drugs or was drinking, unless the evidence *also* shows he became intoxicated to the point he failed to form the requisite intent or attain the requisite mental state." (*People v. Ivans* (1992) 2 Cal.App.4th 1654, 1661; see *People v. Miller* (1962) 57 Cal.2d 821, 830–831 ["The mere fact that a defendant may have been drinking prior to the commission of a crime does not establish intoxication or require the giving of a requested instruction thereon."].)

While there was some evidence defendant may have been intoxicated at the time the crimes were committed, there is a dearth of any evidence establishing, or from which it could be reasonably inferred, defendant lacked the specific mental state required for his crimes due to intoxication.

Defendant acknowledged he was very "hooked up" on drugs at the time of the crimes, and his testimony indicates he had ingested both alcohol and drugs over the course of the entire previous night and while they were at the house all the next day. He also testified that his drug addiction had something to do with what happened. Assuming this limited testimony was substantial evidence of intoxication, there is no evidence linking this alcohol and drug ingestion to a frame of mind that precluded him from

47.

forming the specific intent necessary for certain crimes. (*People v. Williams* (1997) 16 Cal.4th 635, 677–678 [rejecting claim the defendant was entitled to voluntary intoxication instruction based only on some testimony the defendant was "'probably spaced out,'" and that he was "'doped up' and 'smokin' pretty tough then[]'"].)

Defendant did not testify he blacked out or that he did not know what he was doing; in fact, he testified he jumped in between Leal and A.N. when he saw that Leal was hitting her with the bat. He instructed A.N. to do whatever they said so they would not hurt her, and he admitted he knew at that moment "it was a very big mistake." He also testified that, at the end of the day, he was actively trying to get A.T. to leave before Leal could harm A.T. Defendant was able to recount the events at trial without any gaps in his memory, and he did not claim periods of unconsciousness or time frames during the commission of the crime for which he could not account. While memory blackouts and/or unconsciousness are not a necessary predicate for a voluntary intoxication instruction, it is an example of evidence that would have tended to show he failed to formulate the requisite intent for the crimes committed over the course of the day. Such evidence was absent here.

Defendant argues the inordinate amount of alcohol and drugs consumed over the hours before and during the crimes created a commonsense inference that he lacked the requisite intent for the specific-intent crimes charged. This argument is unpersuasive. Although defendant testified they had consumed alcohol and narcotics through the night and continued into the next day, there is no evidence of what or how much he actually ingested or smoked. Even if we assume it was a substantial amount, this gives no indication of the level of his intoxication when the crimes were committed, particularly as he admitted to being an addict and no information about his tolerance levels are known. Finally, even if we assume further that he was intoxicated at the time the crimes were committed, there is simply no evidence to conclude he was intoxicated to a level that precluded his ability to formulate the mental state required for the crimes. In fact, there is

48.

strong evidence to the contrary. (See *People v. Marshall* (1996) 13 Cal.4th 799, 848 ["Although the offenses were committed after [the] defendant had gone virtually without sleep for approximately 24 hours, and after he had drunk an unspecified number of alcoholic drinks over a period of some hours, evidence of the *effect* of [the] defendant's alcohol consumption on his state of mind is lacking."].)

As such, there is a satisfactory reason why defense counsel may have chosen not to request the voluntary intoxication instruction. Moreover, because the instruction was not warranted given the evidence presented at trial, defendant cannot establish any error in this regard was prejudicial. (*People v. Maury*, *supra*, 30 Cal.4th at p. 389; *Strickland v. Washington*, *supra*, 466 U.S. at p. 694.) Defendant's claim of ineffective assistance of counsel fails.

## III. Sentencing Issues

### A. Unauthorized Sentence on Count 6

Imposition of a gang enhancement is mandatory rather than discretionary (*People v. Le* (2015) 61 Cal.4th 416, 423), but the trial court may strike the additional punishment under section 186.22, subdivision (g), or strike or dismiss the enhancement or its punishment under section 1385, subdivisions (a) and (b)(1).

On count 6 (first degree burglary), the jury found defendant guilty, found true that the burglary was committed in an inhabited dwelling, that defendant committed the burglary while a person was present, and found true the gang enhancement allegation under section 186.22, subdivision (b).

The court imposed sentence as follows: "In Count 6, the defendant's committed to state prison for the upper term of six years with credit for 1,142 days spent in custody awaiting sentence plus 171 days which are [section] 2933.1 credits for a total of 1,313 days, and that's to run concurrent to Count 3 and to be stayed pursuant to [section] 654."

However, as to the gang enhancement found true by the jury on this count under section 186.22, subdivision (b), the court did not impose any sentence. The abstract of

judgment indicates the imposition of a sentence under section 186.22, subdivision (b), which was then stayed, but this is not controlling. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

Perhaps, as the abstract of judgment suggests, the court meant to impose sentence for the enhancement and then stay its execution under section 654. But nonetheless, the court must still impose the sentence. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1466 [no authority for court to refrain from imposing sentence on all counts]; accord, *People v. Strike* (2020) 45 Cal.App.5th 143, 154.)

It is also possible the court intended to exercise its discretion to strike or dismiss the enhancement under section 186.22, subdivision (g), or section 1385. Whether the trial court meant to strike the enhancement, or, instead, meant to impose and stay execution pursuant to section 654, the court must do so expressly. (See *People v. Vega* (2013) 214 Cal.App.4th 1387, 1397.)

"It is well established in California … that a trial court's failure either (1) to pronounce sentence on a statutory sentence-enhancement allegation based upon a finding by the trier of fact or an admission by the defendant that the allegation is true, or (2) to exercise its discretion—to the extent imposition of the enhancement is discretionary—to either strike the enhancement allegation or impose the enhancement, results in an unauthorized sentence." (*People v. Vizcarra* (2015) 236 Cal.App.4th 422, 432.) Because the failure to impose a sentence for the gang enhancement on count 6 constitutes an unauthorized sentence, remand is required for resentencing.

### B. *Dueñas* Claim

The trial court imposed a $2,000 restitution fine under section 1202.4, subdivision (b)(1), and the court also imposed a corresponding parole revocation fine (§ 1202.45) in the same amount, which was stayed, a $320 court operations assessment (§ 1465.8, subd. (a)(1)), and a $240 criminal conviction assessment (Gov. Code, § 70373).

Relying on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which was issued while this appeal was pending, defendant contends remand is required to determine his ability to pay the fines and assessments levied against him. If he has no ability to pay, the assessments should be reversed and the execution of the restitution fine should be stayed.

In *Dueñas*, the court held the assessments under Penal Code section 1465.8 and Government Code section 70373 may be "imposed only on those with the means to pay them[]" (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1168–1169), and "that although the trial court is required by Penal Code section 1202.4 to impose a restitution fine, the court must stay the execution of the fine until and unless the People demonstrate that the defendant has the ability to pay" (*id.* at p. 1172).

We conclude it is unnecessary to reach defendant's *Dueñas* arguments given remand of this matter for resentencing. Defendant may address his inability-to-pay assertion pursuant to *Dueñas* with the trial court in the first instance.

### C.     Presentence Credits

While in custody prior to being sentenced, defendant earned presentence custody and conduct credits. Defendant argues the court erred by failing to apply the earned credits to his indeterminate term imposed on counts 1, 2 and 4.

In pronouncing sentence, the trial court imposed a term of imprisonment for each convicted count, but noted with each imposed term what credits would be applied, rather than announcing the total credits that would apply to the aggregate sentence at the conclusion. Thus, for example, as to the principal, determinate term, the court imposed sentence as follows: "In Count 3, the defendant's gonna be committed to state prison for the upper term of three years plus an additional and consecutive four years pursuant to [section] 186.22[, subdivision ](b) (1) (A) for a total term of seven years with credit for 1,142 days spent in custody awaiting sentence plus 171 days credit pursuant to [section] 2933.1 for a total of 1,313 days."

For each successive determinate term imposed, the court similarly noted the presentence credits to be applied. When the court imposed sentence on counts 1, 2 and 4, however, the court indicated zero presentence credits were to be awarded: "In Count 1, the defendant is committed to state prison for the term of 15-years-to-life pursuant to [section] 186.22[, subdivision ](b) (4) (B) with zero presentence credits. That term is to run consecutive to Count 3." Upon imposing the term for counts 2 and 4, the court likewise indicated "zero presentence credits" would be awarded.

A separate abstract of judgment was completed for the determinate and indeterminate terms. The "FELONY ABSTRACT OF JUDGMENT – DETERMINATE," Judicial Council Forms, form CR-290, indicates at number 16 (the credit for time served grid) the number of "TOTAL CREDITS" for case A is 1,313 days, the "ACTUAL" total box shows 1,142 days, and the "LOCAL CONDUCT" credit box shows 171 days. The "ABSTRACT OF JUDGMENT – PRISON COMMITMENT – INDETERMINATE," Judicial Council Forms, form CR-292, indicates at number 14 (the credit for time served grid) a "0" in each box denoting "TOTAL CREDITS," "ACTUAL" credits, and "LOCAL CONDUCT" credits.

The parties do not dispute the actual calculation of presentence credits. However, they appear to dispute whether the court pronounced the sentence improperly by indicating zero presentence credits would be awarded on the indeterminate term imposed on counts 1, 2, and 4 and whether the abstract of judgment on the indeterminate term properly indicates zero credits.

As this case shall be remanded for resentencing, defendant may raise this issue with the trial court in the first instance.

## DISPOSITION

The matter is remanded to the trial court with directions to resentence defendant in accordance with this opinion.  In all other respects, the judgment is affirmed.

MEEHAN, J.

WE CONCUR:

PEÑA, Acting P.J.

DESANTOS, J.